IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

| | |
|---|---|
| GARY L. QUIGG, | CV 18-00086-H-BMM-JTJ |
| Plaintiff, | |
| vs. | ORDER AND FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |
| PAUL REES, | |
| Defendant. | |

Pending is Defendant's Motion for Summary Judgment (Doc. 33) and Plaintiff's Motion in Limine (Doc. 45). Mr. Quigg's Motion in Limine will be denied. The motion for summary judgment should be granted and this matter should be dismissed.

## I. STATEMENT OF CASE

Mr. Quigg was in an industrial accident in 1993 and suffered a herniated disc as a result. Immediately after his injury, he was prescribed medications which enabled him to walk without the use of crutches. These medications were effective in controlling Mr. Quigg's pain and he used them for a considerable period. (Quigg Affidavit, Doc. 3-1 at 1.) He contends that only a limited type of prescription drugs have proven effective in treating his pain. (Quigg Affidavit, Doc. 3-1 at 2.)

Mr. Quigg was incarcerated in Montana State Prison (MSP) in October 2015

1

and he alleged in his Complaint that he was provided the effective pain medications that he arrived with and he continued to receive those "effective pain medications" until his transfer from prison.[1]  Upon his return to MSP in July 2017, Mr. Quigg informed medical staff about his need for "effective medications" to control severe, chronic pain that adversely affected his daily activities, the ability to exercise, and to remain active.  Mr. Quigg met personally with Dr. Rees on a number of occasions and requested "effective medications" to treat his severe and chronic pain.  Dr. Rees referred Mr. Quigg to the Pain Committee three times but Mr. Quigg contends Dr. Rees never informed him of the Committee's decisions. Mr. Quigg alleged Dr. Rees has a personal bias and prejudice against the use of any medication that is effective in alleviating severe, chronic pain, and that Dr. Rees bragged that he was going to completely stop the use of "effective pain medications" for the entire prison population.

Mr. Quigg also alleged that he has Stage III kidney disease and Dr. Rees and his staff encouraged him to take medications which were counter-indicated for this condition and refused to give him an order for a kidney healthy diet.  He also contends that Dr. Rees failed to provide him with a non-Warfarin drug for his atrial fibrillation as recommended by a Billings Clinic cardiologist.  Finally, he contends

---

[1]According to the Montana Department of Corrections Movement record, Mr. Quigg entered MSP on October 8, 2015 and was transferred to Yellowstone County Jail on December 29, 2015.  (Doc. 35-3.)

that Dr. Rees refused to provide medications and bone density testing for his
osteoporosis.  (Complaint, Doc. 2 at 2-6.)

## II.  MOTION IN LIMINE

Mr. Quigg seeks an order limiting consideration of certain information
Defendants have submitted.  First, he contends that pages 8-18, 37-48, and 68-72
of Exhibit A to Defendant's Statement of Undisputed Facts should not be
considered by the Court when deciding the motion for summary judgment because
the exhibits are illegible and Defendant refused to provide a reasonable translation
as requested in discovery.  (Doc. 45 at 1.)  The Court, however, agrees with
Defendant that for the most part these 27 pages are readable, and the Court can
only rely upon that which it can read.  Dr. Rees is not required to create documents
for Mr. Quigg during discovery.  Mr. Quigg could have propounded additional
interrogatories or other discovery to clarify the content of any documents which he
contends was illegible.

Mr. Quigg also argues that Dr. Rees could not remember the numbers of
grievances, lawsuits from other states, and Medical Board complaints that had been
filed against him and therefore Mr. Quigg was unable to demonstrate a continuing
course of deliberate indifference toward patients.  But as set forth below, the Court
finds that Mr. Quigg has not shown that Dr. Rees was deliberately indifferent to
Mr. Quigg's serious medical needs.  Even if there was evidence of other

grievances, lawsuits, and complaints against Dr. Rees, Mr. Quigg must still establish that Dr. Rees acted inappropriately in this case.  He has not done so.

Mr. Quigg also seeks an order preventing Dr. Rees from using information that he did not possess prior to making his medical decisions about Mr. Quigg. (Doc. 45 at 4.)  Mr. Quigg does not indicate specifically what information to which he is referring and as such the motion will not be granted on this basis.

The motion in limine will be denied.

## III.  MOTION FOR SUMMARY JUDGMENT

### A.  Standard

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  Under summary judgment practice, "[t]he moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the

adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1)(A), (B).

"Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B).  Summary judgment should be entered, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.*

If the moving party meets its initial responsibility, the burden shifts to the opposing party to establish that a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  To establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific

facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  *See* Fed.R.Civ.P. 56(c)(1); *Matsushita*, 475 U.S. at 586 n.11.  "A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence."  *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and that the dispute is genuine, i.e., "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

     "In evaluating the evidence to determine whether there is a genuine issue of fact," the court draws "all inferences supported by the evidence in favor of the non-moving party."  *Walls v. Cent. Costa Cnty. Transit Auth.*, 653 F.3d 963, 966 (9th Cir. 2011).  It is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  *See Richards v. Nielsen Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586 (citations omitted).

     Defendant advised Mr. Quigg of the requirements for opposing a motion

brought pursuant to Rule 56 of the Federal Rules of Civil Procedure in the October

10, 2019 "Notice and Warning to Plaintiff" (Doc. 36). *See Rand v. Rowland*, 154

F.3d 952, 957 (9th Cir.  1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th

Cir.  1988).

### B.  Facts

Mr. Quigg's claims arise from his incarceration at MSP between July 2017

and December 2018.  By way of background, during a period of time that Mr.

Quigg was not incarcerated, he was seen by Dr. Glenn Guzman, a family medicine

practitioner at the Billings Clinic.  Mr. Quigg did not produce any medical records

from Dr. Guzman, but Defendants produced a series of progress notes from Dr.

Guzman between April 28, 2011 and July 15, 2015.  Dr. Guzman saw Mr. Quigg

for multiple medical issues including his low back pain.  According to Mr. Quigg,

at least some of his complaints of chronic back and neck pain resulted from a 1993

industrial accident.  (Defendant's Statement of Undisputed Facts, Doc. 35

(hereinafter "SUF") at ¶ 10, Mr. Quigg's Statement of Disputed Facts, Doc. 44

(hereinafter "SDF") at ¶ 10.)

Dr. Guzman saw Mr. Quigg on April 28, 2011 for a preoperative visit prior

to Mr. Quigg's May 4, 2011 disc replacement surgery.  At that time, Mr. Quigg

was taking several medications including Percocet for pain, Soma (carisoprodol) as

needed for muscle spasms, Fosamax, aspirin, atenolol, calcium with vitamin D,

and a separate vitamin D supplement.  (Doc. 35-2 at 384-285.)  He continued to

receive most of these medications until his incarceration in 2015.  Throughout his

treatment of Mr. Quigg, Dr. Guzman made slight changes to his medications and at

times attempted to get him off Soma but by August 2013, Mr. Quigg was back on

Soma and was taking morphine for his pain.  (Doc. 35-2 at 325.)  In April 2014,

Mr. Quigg was taking MS Contin (morphine sulfate) for pain but had discontinued

the use of methocarbamol as it was not particularly helpful.  (Doc. 35-2 at 320.)

On July 15, 2015, at what appears to be his final visit with Dr. Guzman, Mr.

Quigg was prescribed MS Contin (morphine sulfate) and Soma (carisoprodol) as

needed.  At that time, Mr. Quigg was taking Cialis, Fosamax, MS Contin, Prilosec,

albuterol, aspirin, carisoprodol, hydrochlorothiazide, lisinopril, and triamcinolone.

(Doc. 35-2 at 242.)  Mr. Quigg was again reminded that Soma was not an ideal

agent, but Dr. Guzman noted that Mr. Quigg had been on it for years.  (Doc. 35-2

at 241.)  Dr. Guzman also noted at the July 15, 2015 visit that there was a

questionable history of polycythemia (a blood condition) because Mr. Quigg's

brother had some issues with it.  Dr. Guzman, however, saw no evidence of a

formal diagnosis of it in Mr. Quigg and removed it from Mr. Quigg's problem list.

(Doc. 35-2 at 241.)

Mr. Quigg was held at the Yellowstone County Detention Facility (YCDF)

from September 15, 2015 until October 8, 2015 when he was transferred to MSP.

Mr. Quigg has alleged in a different lawsuit that upon his arrival at YCDF a nurse took his pain medications (morphine and carisoprodol (Soma)) and refused to give him those medications while he was at YCDF.  (*Quigg v. Bell*, Civil Action No. 17cv35, Complaint, Doc. 4 at 6.)  He was held at MSP from October 8, 2015 until December 29, 2015.  He alleged in his prior lawsuit that when he was returned to YCDF from MSP on December 29, 2015, MSP medical staff gave the transport officer two bottles of medications prescribed by a DOC doctor for oxycontin and carisoprodol plus two paper prescriptions for refills of these medications.  (*Quigg v. Bell*, Civil Action No. 17cv35 Complaint, Doc. 4 at ¶ 10.)  Mr. Quigg also alleged he was not provided the "effective pain medications" during his incarcerations at YCDF, Crossroads Correctional Facility, and Big Horn County Jail between December 29, 2015 and his transfer to MSP in July 2017.  (*Quigg v. Bell*, Civil Action No. 17cv35, Complaint, Doc. 4.)

The events at issue in this lawsuit began on July 30, 2017 when Mr. Quigg was again transferred to MSP.  While at MSP between July 13, 2017 and December 18, 2018, Mr. Quigg had a number of health-related issues, including, atrial fibrillation, chronic back and neck pain, arthritis, gout, chronic kidney disease, chronic obstructive pulmonary disease (COPD), obstructive sleep apnea, polycythemia, hypertension, restless leg syndrome, chemical dependency, osteoporosis, gastroesophageal reflux disease, and hearing loss.  (SUF at ¶ 3.)

During this time period, Mr. Quigg was either seen by Dr. Rees or another medical care provider at least once a month and often more frequently.  (SUF at ¶ 4.)

Defendant Dr. Paul Rees has been employed with the Montana Department of Corrections (DOC) as a physician at MSP since December 1, 2016.  (SUF at ¶ 1, undisputed.)  Dr. Rees was a healthcare provider at MSP during Mr. Quigg's incarceration at MSP in 2017-2018.  (SUF at ¶ 2, undisputed.)

When Mr. Quigg entered MSP on July 13, 2017, he had a prescription history of long-term opiate/opioid and heavy narcotic use, including Dilaudid (containing hydromorphone, an opioid), oxycontin, morphine (an opiate), Percocet (containing oxycodone), and MS Contin (an opioid).  (SUF at ¶ 17, modified to indicate that this prescription history was when Mr. Quigg came to the prison in July 2017 as opposed to when he first entered the prison in 1969.)  Mr. Quigg's outside medication list dated July 13, 2017 listed aspirin (for atrial fibrillation), HCTZ (hydrochlorothiazide—a diuretic), omeprazole (for indigestion), lisinopril (for hypertension), and cal/carb +C (for osteoporosis).  (Doc. 35-2 at 387; Doc. 43-2 at 13; SUF at ¶ 52; SUF at ¶ 57.)

On July 13, 2017, Mr. Quigg saw a Nurse Practitioner at intake at MSP who advised him to speak to the doctor regarding medications for his pain management as his previous medications were beyond the scope of her practice.  (Doc. 35-2 at 177.)  On August 2, 2017, he submitted a medical kite explaining that he had

10

severe chronic pain for which he used to receive effective medications.  He explained that medications like Neurontin, amitriptyline, and tramadol were not effective and because he had kidney disease, he was instructed not to take Tylenol or non-steroidal anti-inflammatory drugs like ibuprofen.  (Doc. 35-2 at 173.)  He was scheduled to see a physician.  *Id.*

On September 8, 2017 and September 18, 2017, Mr. Quigg asked about the timeframe for seeing a doctor because he had been referred for physician consult on August 8, 2017 and had not seen one and had been unable to get medications for his condition.  (Doc. 35-2 at 166, 168.)  He was advised that he had an appointment scheduled and that his previous appointment had to be rescheduled due to time constraints.  *Id.*  He was told in response to one kite to get ibuprofen or Tylenol from the cages or canteen to alleviate his discomfort.  (Doc. 35-2 at 165.)

Mr. Quigg was first seen by Dr. Rees on September 25, 2017.  Dr. Rees ordered labs, an EKG,[2] he referred Mr. Quigg to the Pain Management Committee, and ordered a consult with mental health for cognitive behavioral therapy (CBT).  Mr. Quigg was to be seen for a chronic care visit in three months.  (Doc. 35-2 at 16-17.)

Dr. Rees referred Mr. Quigg's file to the Pain Management Committee in order to obtain a chronic pain treatment plan in light of Mr. Quigg's prolonged

---

[2] Mr. Quigg was given an EKG in November 2017.  (Doc. 35-2 at 121.)

11

history of using multiple prescription narcotics, opioids, and opiates as well as his

self-reported history of withdrawal symptoms related to prescription drugs.  (SUF

at ¶ 19.)  Mr. Quigg disputes that there was a legitimate, medically acceptable need

for the referral to the Pain Management Committee.  (SDF at ¶ 19.)

The Pain Management Committee is a multi-disciplinary team from multiple

MSP departments.  The committee's members discuss a global, multi-modal

approach to managing patients' chronic pain.  The committee consists of medical

providers, nursing staff and administrators, occasionally mental health providers,

and correctional officers if needed to provide objective, passive observations of an

inmate for signs of pain in his daily life.  The committee functions as a team.  Its

purpose is to collectively assess patients' medical needs.  Members of the

committee rotate, and Dr. Rees is sometimes a committee member.  (SUF at ¶¶ 12-

16.)

On October 19, 2017, the Pain Committee issued a Chronic Pain Treatment

Plan for Mr. Quigg.  (Doc. 35-2 at 124.)  The committee recommended Mr. Quigg

be provided non-narcotic modalities to treat his pain.  (SUF at ¶ 20.)  The initial

treatment plan included stretching techniques, weight loss and "HEP/Cymbalta/

Acetaminophen possible Lidoderm patches."  (Doc. 35-2 at 124.)

Mr. Quigg had a chronic care visit on December 28, 2017 where he again

requested pain medications.  The note indicated that he had not been taking his

HCTZ nor his inhalers and was refusing lab draws.  (Doc. 35-2 at 71.)

In February 2018, Dr. Rees again referred Mr. Quigg's file to the Pain Management Committee for his alleged chronic pain.  (SUF at 21.)  The committee again recommended non-narcotic modalities, including muscle stretching, muscle strengthening, hot/cold therapy, and muscle rubs.  (SUF at 22.)   Mr. Quigg contends there was never any explanation as to how these matters could be accomplished.  (SDF at 22.)

Dr. Rees's chronic clinic note on May 21, 2018 indicated that in protest for not being placed on narcotics, Mr. Quigg had been refusing all medications except HCTZ (a diuretic) and ASA (aspirin).  (Doc. 35-2 at 69.)

In July 2018, Dr. Rees referred Mr. Quigg's file to the Pain Management Committee for the third time.  (SUF at 23.)  As before, the committee recommended non-narcotic modalities, including stretching, weight loss, and medications.  (SUF at 24.)  Mr. Quigg contends that his weight had not changed in this period and no such referrals for "weight loss" had been made the first two times; and no adequate, effective medications of any kind were offered or made available.  (SDF at 24.)[3]

Each time Dr. Rees referred Mr. Quigg's file to the Pain Management

---

[3]Weight loss was recommended on the October 19, 2017 Chronic Pain Treatment Plan. (Doc. 35-2 at 124.)

Committee, Dr. Rees incorporated the committee's recommendations for treating Mr. Quigg's chronic pain into his treatment plan.  (SUF at 25.)  Mr. Quigg contends that Dr. Rees controlled the Pain Committee.  (SDF at 25.)

Medical providers, including Dr. Rees, informed Mr. Quigg of the committee's decisions and discussed his pain management plan with him on several occasions.  (SUF at 26.)  Mr. Quigg contends, however, that he did not meet with the committee members to discuss his pain and without seeing them, the committee would only be able to rely on what Dr. Rees presented.  (Quigg Declaration at 6, ¶ 9-G.)

During Dr. Rees's tenure as one of his physicians, Mr. Quigg was prescribed the following medications at various times, when needed and when he did not refuse:  Calcium, an antacid to treat indigestion; Calcium+ D, to treat osteoporosis; Triamcinolone, to treat eczema; Aspirin, an anti-platelet therapy to prevent heart attacks and strokes; Hydrochlorothiazide, a diuretic used for edema and hypertension; Omeprazole, to treat dyspepsia (indigestion); a Ventolin HFA inhaler, to treat bronchospasm; Carvedilol, to treat hypertension tachyarrhythmias associated with atrial fibrillation; an Alvesco inhaler, to treat COPD; Chlorhex, to treat periodontal disease; Amlodipine, to treat hypertension; Acetaminophen, a pain reliever; Cephalexin, an antibiotic for infection; Indomethacin, an anti-inflammatory for pain; Lisinopril, to treat hypertension; a Xopenex HFA inhaler, to

treat asthma; Methylprednisolone Sod injections to treat pain; Steroid anti-

inflammatory injections to treat pain; and an Atrovent HFA inhaler, a cholinergic

used to treat Bronchospasm.  (SUF at ¶ 57.)  Mr. Quigg contends that not all of

these medications were used at MSP and they were not necessarily prescribed by

Dr. Rees.  He also argues that some of these medications were attempted and found

ineffective or they had been found to be ineffective in the past; or they were known

to Mr. Quigg to be contraindicated with his other medical conditions.  (SDF at ¶

57.)

Mr. Quigg repeatedly refused to take medications for his chronic pain and

high blood pressure\hypertension, NSAIDS, muscle relaxers, and neuromodulators,

requesting narcotics or opioids instead.  (SUF at ¶ 58.)  Mr. Quigg contends he was

only requesting medications that were adequate and effective.  (SDF at ¶ 58.)

According to Dr. Rees, Mr. Quigg refused to take recommended medications

to treat his polycythemia and blood clots, but he does not provide the name of the

recommended medication.  (SUF at ¶ 59.)  Mr. Quigg contends Dr. Rees did not

recommend any medication to treat polycythemia and blood clots despite Mr.

Quigg's request for an examination by a professional hematologist and for

medications.  (SDF at ¶ 59.)  Dr. Rees also testified that Mr. Quigg refused

diagnostic blood draws on multiple occasions and did not return the materials

provided to him for hemoccult testing.  (SUF at ¶ 60.)  Mr. Quigg disputes that he

15

did not return hemoccult testing materials.  (SDF at ¶ 60.)

Mr. Quigg's refusals to accept medical care made it difficult for MSP

medical staff to assess and treat his various medical issues.  (SUF at ¶ 62.)  Upon

each refusal, Mr. Quigg was counseled about the potential consequences of

refusing treatment, including the possibility of stroke or death.  (SUF at ¶ 63.)  Mr.

Quigg disputes that he received "counseling" from Dr. Rees or other Infirmary

staff.  (SDF at ¶ 63.)

### C. Analysis

To prove a § 1983 claim for violation of the Eighth Amendment based on

inadequate medical care, a plaintiff must show "acts or omissions sufficiently

harmful to evidence deliberate indifference to serious medical needs."  *Estelle v.*

*Gamble*, 429 U.S. 97, 106 (1976).  Thus, to prevail, Mr. Quigg must show both

that his medical needs were objectively serious, and that Defendant possessed a

sufficiently culpable state of mind.  *Wilson v. Seiter*, 501 U.S. 294, 299 (1991);

*McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (on remand).  The

requisite state of mind for a medical claim is "deliberate indifference."  *Hudson v.*

*McMillian*, 503 U.S. 1, 5 (1992).

A serious medical need exists if the failure to treat a prisoner's condition

could result in further significant injury or the unnecessary and wanton infliction of

pain.  Indications that a prisoner has a serious need for medical treatment are the

following:  the existence of an injury that a reasonable doctor or patient would find

important and worthy of comment or treatment; the presence of a medical

condition that significantly affects an individual's daily activities; or the existence

of chronic and substantial pain.  *Wood v. Housewright*, 900 F.2d 1332, 133741 (9th

Cir. 1990) (citing cases); *Hunt v. Dental Dept.*, 865 F.2d 198, 200–01 (9th Cir.

1989); *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on*

*other grounds, WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en

banc).  The Court will presume for purposes of these Recommendations that Mr.

Quigg has serious medical needs.

  Once there is a showing of a serious medical need, a plaintiff must show that

a defendant was deliberately indifferent to that need.  In *Farmer v. Brennan*, 511

U.S. 825 (1994), the Supreme Court established a demanding standard for

"deliberate indifference."  Negligence is insufficient.  *Farmer*, 511 U.S. at 835.

Deliberate indifference is established only where the defendant subjectively

"knows of and disregards an excessive risk to inmate health and safety."  *Toguchi*

*v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (internal citation omitted).

Deliberate indifference can be established "by showing (a) a purposeful act or

failure to respond to a prisoner's pain or possible medical need and (b) harm

caused by the indifference."  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)

(internal citations omitted).

A physician need not fail to treat an inmate altogether to violate that inmate's Eighth Amendment rights. *Ortiz v. City of Imperial*, 884 F.2d 1312, 1314 (9th Cir. 1989). A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case. *Id.*

### 1. Pain Management

Mr. Quigg alleges Dr. Rees refused to provide him medications which had previously proven effective to treat his pain. There are several issues with these claims. First, there is no clear statement of what medication Mr. Quigg contends should have been prescribed. He only describes them as "effective medications." Dr. Rees contends that Mr. Quigg was requesting narcotic or opioid medications. Mr. Quigg contradicts himself somewhat in his arguments. First, he contends he never requested any "narcotic and opioid/opiate drugs" and had only requested drugs that he had been previously prescribed and that he had found from his personal experience to be both adequate and effective. (Doc. 43-2 at 10, ¶ 9-S.) But later in the same declaration he states, "the only adequate and effective medications I have used that provided relief of severe, chronic pain have been those that are classified as narcotic or opiate-style drugs." (Doc. 43-2 at 15, ¶ 11.) He argues that he told Dr. Rees the various kinds of medications which have proven to be adequate and effective (Doc. 43-2 at 6) but he does not explain to the

Court what those medications were or who previously prescribed them and he does not produce any medical records to support such assertions.

For purposes of these Recommendations, the Court assumes that Mr. Quigg is referring to morphine derivatives like OxyContin, MS Contin, Percocet, etc. which he testified he had been prescribed since 1993.  Mr. Quigg alleges these "effective medications" were prescribed by his family practitioner in Billings, surgeons, and even the previous prison doctor who Dr. Rees replaced.  But he presented no medical records to support this statement.  The only medical records in the record are those presented by Defendant.  Defendant did present some records from 2011-2012 from Dr. Guzman wherein Mr. Quigg was prescribed pain medications for his back.  Mr. Quigg contends his medical records demonstrate that he suffers from severe, chronic pain and that he has for many years been prescribed effective medications which alleviated such pain and enabled him to work, remain active, exercise, and control his pain-induced high blood pressure without the use of high blood pressure medications.  (Quigg Disclosure Statement, Doc. 27at 2.)  But Mr. Quigg did not produce any medical records to support his claims.

But even if other doctors prescribed Mr. Quigg narcotic/opiate pain medication, Mr. Quigg's allegations are still insufficient to establish an Eighth Amendment claim.  Differences in judgment as to appropriate medical diagnosis

and treatment between an inmate and prison medical providers—or, for that matter,

between medical providers—are not enough to establish a deliberate indifference

claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "A difference of

medical opinion between a prisoner-patient and prison medical authorities

regarding treatment does not give rise to a § 1983 claim." *Franklin v. Oregon*, 662

F.2d 1337, 1344 (9th Cir. 1981).

Courts have routinely held that the decision alone to provide alternative pain

medications does not establish deliberate indifference. *See Fausett v. LeBlanc*, 553

Fed.Appx. 665 (9th Cir. 2014) (affirming summary judgment for defendants where

doctors did not provide Valium ordered in hospital-discharge instructions after

spinal-fusion surgery and instead provided substitute medicine and other pain

medications); *Gauthier v. Stiles*, 402 Fed.Appx. 203 (9th Cir. 2010) (plaintiff's

disagreement with the dosage and type of pain medication administered after

surgery not deliberate indifference); *Shiira v. Hawaii*, 706 Fed. Appx. 436 (9th

2017) (affirming summary judgment for defendants who deprived plaintiff of

methadone and Percodan but offered over-the-counter pain medication and

treatment for potential detoxification symptoms; plaintiff's expert did not testify

that offering alternative pain medications would be medically inappropriate);

*Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (reversing denial of defense

motion for summary judgment; jail health-care provider's decision to provide

synthetic opioid rather to provide opioids or contact the doctor who prescribed the

opioids before incarceration was not deliberate indifference); *Brauner v. Coody*,

793 F.3d 493, 497 (5th Cir. 2015) (although plaintiff stated that he required more

pain relief than the over-the-counter and prescription medications provided by

prison doctors for his undisputed bone infection with open sores, "these are 'classic

example[s] of a matter for medical judgment' " and, as a matter of law, do not

amount to deliberate indifference); *Hill v. Curcione*, 657 F.3d 116, 123 (2nd Cir.

2011) (district court properly dismissed claim that prison officials were

deliberately indifferent in not prescribing medication stronger than Motrin for

plaintiff's broken wrist because the medication decision was a matter of medical

judgment); *Meuir v. Green Cnty. Jail Employees*, 487 F.3d 1115, 1119 (8th Cir.

2007) (summary judgment properly granted for defendants on inmate's claim that

nurses were deliberately indifferent in prescribing Motrin but not medicated

mouthwash for bleeding gums); *Tabb v. Veazey*, 2007 WL 951763 (N.D.Ga.

March 28, 2007) (district court found that a policy of denying narcotics to inmates

in the jail was not unconstitutional because it "did not deny detainees and prisoners

the right to obtain [effective] non-narcotic drugs"); *Wesley v. Sayre*, 2010 WL

3398526, *7 (N.D.Cal. 2010) (summary judgment granted in favor of defendants

on deliberate indifference claim where they prescribed plaintiff Tylenol with

codeine to replace methadone, along with physical therapy, injections for pain, and

consultation with a pain specialist); *Thomas v. Coble*, 55 F. App'x 748 (6th Cir. 2003) (affirming dismissal of deliberate indifference claim based upon failure to prescribe requested pain medication where plaintiff had been prescribed pain medications, just not the ones he requested); *Greenman v. Prisoner Health Servs.*, No. 1:10-cv-549, 2011 WL 6130410, at *10 (W.D. Mich. Dec. 8, 2011) ("Plaintiff's preference for narcotics and his dissatisfaction with the non-narcotic pain medications prescribed by [defendant physician] falls far short of supporting an Eighth Amendment claim.").

Therefore, the fact that other doctors may have prescribed different medications or that Mr. Quigg disagrees with Dr. Rees's decision not to provide him with specific medications does not plausibly support an Eighth Amendment claim. Instead, "to prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (*quoting Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)). That is, Mr. Quigg must demonstrate that Dr. Rees's decision to provide alternative medications and treatments instead of the medications Mr. Quigg preferred was medically unacceptable and done in conscious disregard to Mr. Quigg's health. Mr. Quigg has not presented sufficient evidence to make this

22

showing.

Mr. Quigg failed to present evidence to establish that the non-narcotic pain management program was medically unacceptable or done in deliberate indifference of Mr. Quigg's medical needs.  In Dr. Rees's opinion, non-narcotic and non-opioid/opiate methods of treating pain are particularly important in cases such as Mr. Quigg's, where the patient has a history of prolonged prescription opiate and narcotic use as well as a self-reported history of dependency and withdrawal symptoms.  The combination of all these factors put Mr. Quigg at a high risk of developing (if he had not already developed) a narcotic and opiate dependence, hyperalgesia, tolerance, and possibly addiction.  (SUF at ¶ 27, disputed.)  Dr. Rees was concerned about Mr. Quigg's history of prolonged narcotic and opioid use as well as his self-reported history of withdrawal symptoms related to prescription drugs.  (SUF at ¶ 28.)  According to Dr. Rees, continued use of the opioid receptor agonists Mr. Quigg demanded, such as oxycodone, leads to their down-regulation, resulting in a condition referred to as hyperalgesia - i.e., increased pain perception and intensity, even in areas not involved with the primary pain site.  Long-term use of these medications, even if used pursuant to a prescription, can result in addiction.  Mr. Quigg's self-reported withdrawal symptoms, coupled with his long-term use, indicated to Dr. Rees that Mr. Quigg may have already developed a physical dependence to these

medications, or at least was at a high risk for developing such a dependence (if he had not already).  (SUF at ¶ 29, disputed.)  Dr. Rees believes that prescribing opioids to treat Mr. Quigg's complaints of chronic pain would facilitate his development of hyperalgesia and reinforce his problems with chemical dependency.  (SUF at 30, disputed.)  Given Mr. Quigg's history, Dr. Rees believed it was appropriate to treat him with alternative, less addictive methods.  (SUF at 31, disputed.)  It was Dr. Rees's opinion that these methods are no less effective than the narcotic and opioid drugs Mr. Quigg repeatedly requested.  (SUF at 32, disputed.)

Mr. Quigg claims Dr. Rees failed to consider that Mr. Quigg knew that some type of opioid was necessary to provide adequate and effective relief for his unrelenting, severe, and chronic pain.  (SDF at ¶ 27.)  He argues that if Dr. Rees had reviewed his past medical records, he would have realized that the offered treatment and medications had already been used/tried years before without adequate and effective results.  Mr. Quigg contends common sense and sound medical practices indicate that once a course of treatment and/or medications have been tried without benefit there would be no reason to keep trying the same things over.  (SDF at ¶ 31.)  Based on previous usage, Mr. Quigg contends the types of medications Dr. Rees was prescribing for his pain were medications classified as anti-seizures, anti-anxiety, anti-depressants, and were known to Mr. Quigg to be

inadequate and ineffective, as well as having bad side effects.  (SDF at ¶ 65.)  Mr.

Quigg contends that limiting opioids for him was especially difficult because of the

other medical conditions he suffers including kidney disease, high risk of bleeding

due to concomitant use of anticoagulant medications, gastrointestinal disease, and

hepatic function.  (SDF at ¶ 67.)

Dr. Rees contends his method of managing chronic, non-malignant pain is

standardized in that it is non-narcotic, non-opioid based and multimodal, though it

also is individualized for each patient based on each his response, mitigation of

side effectiveness, and other factors depending on his individual circumstances.

(SUF at ¶ 33.)  Mr. Quigg contends Dr. Rees denies adequate and effective pain

medications to everyone regardless of need.  He further contends that Dr. Rees

denied him adequate pain medication before he reviewed Mr. Quigg's past medical

records.  (SDF at ¶ 33.)

Dr. Rees contends that while under his care, Mr. Quigg had access to

treatments and medications that are functional alternatives to opioid and narcotic

medication to treat his pain and discomfort including epidural steroid injections

(ESI), ibuprofen, acetaminophen, and other non-steroidal anti-inflammatory

medications.  (SUF at ¶¶ 34-35, disputed.)  Mr. Quigg disputes that the offered

medications and treatment were "functional alternatives" and argues they were

ineffective, contraindicated for his other medical problems including osteoporosis

and kidney disease, and other medical providers had cautioned him against the use of the treatments and medications recommended by Dr. Rees.  (SDF at ¶¶ 34-36.)

Although Dr. Rees offered these alternative treatments, Mr. Quigg often refused to try these treatments and medications.  (SUF at ¶ 36, undisputed.)  For example, in the fall of 2018, Mr. Quigg was referred to the anesthesiology department at Community Hospital of Anaconda for ESI to treat his chronic back pain, but he refused the treatment.   (SUF at ¶ 61.)  Mr. Quigg explains that he refused this treatment due to ineffectiveness and the caution from the anesthesiologist about the maximum numbers of these procedures to have done in a lifetime.  (SDF at ¶ 61.)  Mr. Quigg does not provide any medical records to support this claim.  Mr. Quigg claims he informed Dr. Rees about having had the three previous ineffective treatments and while Dr. Rees noted Mr. Quigg's issue, he made the order for the same procedure, knowing it to be ineffective.  (SDF at ¶ 62.)

In treating Mr. Quigg's pain, Dr. Rees and other MSP medical staff considered his entire pain system.  (SUF at ¶ 37, undisputed.)  Dr. Rees spoke with Mr. Quigg about his complaints of pain and discomfort, and he and other medical staff observed Mr. Quigg both in a treatment setting during examinations and outside a treatment setting, such as when he was seated in the waiting room of the infirmary, to help assess the degree of pain he suffered.  (SUF at ¶ 38.)

26

Between July 30, 2017 and December 18, 2018, Mr. Quigg submitted around 50 Health Care Request forms and medical staff timely responded to each request.  (SUF at 5.)  Mr. Quigg alleges there were delays in being seen by medical personnel.  (Mr. Quigg's Statement of Disputed Facts, Doc. 44 (hereinafter "SDF") at ¶ 5.)  Also, during this time period, Mr. Quigg received testing and evaluations including multiple physical examinations (which Mr. Quigg describes as occasional cursory, brief exams), a CT scan of his lumbar spine, echocardiograms, and laboratory blood testing and other testing and diagnostic procedures to evaluate his health.  (SUF at ¶ 6, SDF at ¶ 6.)

The undisputed evidence is that Dr. Rees attempted to treat Mr. Quigg's ailments with alternative methods including ESI injections, ibuprofen, acetaminophen, and other NSAIDS.  (SUF at ¶ 35.)  Mr. Quigg contends these medications were ineffective and inadequate for his pain and contraindicated for his other medical problems such as osteoporosis and kidney disease.  (SDF at ¶ 35.)  But Mr. Quigg often refused to even try these treatments and medications (SUF at ¶ 36, undisputed) including ESI injections.

Dr. Rees has explained his reasoning for changing Mr. Quigg's medications, and the Pain Management Committee upheld that decision on three occasions.  Mr. Quigg presented no admissible evidence to demonstrate that the plan to avoid opioid medications and instead use a non-narcotic multimodal pain management

was medically unacceptable.

The Court also notes that Mr. Quigg had not been prescribed narcotic pain medications since December 29, 2015 (a year and a half before coming under Dr. Rees's care).  Mr. Quigg has filed two lawsuits in this Court against various entities complaining that they failed to provide him with adequate and effective pain medications.  In *Quigg v. Bell, et al*, Civil Action No. 17cv00035-GF-BMM-JTJ, Mr. Quigg alleged the United States Marshals, employees and medical providers at Crossroads Correctional Center, employees and medical providers at YCDF, and employees and medical providers at Big Horn County Jail all failed to provide him adequate and effective pain medications during his incarceration in those facilities from September 15, 2015 until July 13, 2017 when he was returned to MSP and instead prescribed ibuprofen and tramadol which Mr. Quigg contends was ineffective.  (*Quigg v. Bell*, Civil Action No. 17cv35, Complaint, Doc. 4 at 7-8.)  Only the claims against YCDF employees and medical providers at YCDF remaining pending in that matter.

Mr. Quigg also contends that he has been denied "adequate medications for the effective control of severe, chronic pain" while in the custody of the Federal Bureau of Prisons.  (Civil Action 19cv03146-LTB filed in the District of Colorado; Letter dated October 29, 2019.)  Given the number of medical providers who have refused to give Mr. Quigg the "effective pain medications" he is seeking, there is

no a genuine issue of material fact that Dr. Rees's decision to provide alternative medications instead of the medications Mr. Quigg preferred was medically unacceptable or done in conscious disregard to Mr. Quigg's health. This claim should be dismissed.

### 2. Atrial Fibrillation

Mr. Quigg contends Dr. Rees failed to provide him with a non-Warfarin drug for his atrial fibrillation as recommended by a Billings Clinic cardiologist instead of aspirin. Atrial fibrillation is a relatively common condition in which the atria (the top two chambers of the heart) fibrillate due to ineffective pacing of the heart by the sinoatrial node (the heart's natural pacemaker). The two most common complications of atrial fibrillation are a rapid heart rate and the development of intra-atrial clots, which can embolize, leading to a stroke. There are several treatment considerations for atrial fibrillation, with a variety of indications and contraindications. Often, atrial fibrillation is treated with an anticoagulant with coumadin, but this treatment requires careful monitoring to maintain a therapeutic range that is effective and prevent over anticoagulation, which can result in catastrophic bleeding complications. (SUF at ¶¶ 46-49, undisputed.)

Mr. Quigg was prescribed aspirin to treat his atrial fibrillation and prevent blood clotting. (SUF at ¶ 52, although Mr. Quigg contends that aspirin is not a

prescription drug.)  Dr. Rees testified that Mr. Quigg's refusals to take prescribed medication or be treated made other treatments too medically risky and given the compendium of Mr. Quigg's medical issues, aspirin was a medically appropriate treatment for this condition.  (SUF at ¶¶ 53-54.)  Dr. Rees testified that his treatment recommendations were based upon Mr. Quigg's most current medical needs after assessing his total health care situation.  (SUF at ¶ 55.)

Mr. Quigg was not compliant with treatment for his various other conditions -- for example, he refused to take his blood pressure medications unless he was prescribed opiates -- and risks for complications with certain atrial fibrillation treatments were high.  (SUF at ¶ 51.)  Mr. Quigg explains that his doctor in Billings had told him that untreated or undertreated pain resulted higher blood pressure levels.  (SDF at ¶ 51 citing Dr. Guzman's records, Doc. 35-2 at 348, 351, 354.)  Mr. Quigg explained that the blood pressure medications Dr. Rees prescribed caused side effects of drowsiness that Mr. Quigg contends could have been avoided by prescribing a medication that was adequate and effective for pain control.  (SDF at ¶ 51.)

Again, Mr. Quigg has not presented any admissible evidence to support his claim.  He refers to newspaper and medical articles, but those articles are inadmissible.  Mr. Quigg was prescribed aspirin to treat his atrial fibrillation and prevent blood clotting.  (SUF at ¶ 52, although Mr. Quigg contends that aspirin is

not a prescription drug.)  Mr. Quigg has not presented sufficient admissible

evidence to create an issue of fact regarding whether Dr. Rees' "chosen course of

treatment 'was medically unacceptable under the circumstances,' and was chosen

'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*,

391 F.3d at 1058.  This claim should be dismissed.

### 3.  Kidney Disease

Mr. Quigg also alleged that he has Stage III kidney disease and Dr. Rees and

his staff encouraged him to take medications which were counter-indicated for this

condition and refused to give him an order for a kidney healthy diet.  But the

undisputed testimony is that Mr. Quigg's renal functions improved while he was at

MSP, as evidenced by the lower creatinine numbers found by his diagnostic draws.

(SUF at ¶ 41.)  Given the improvement of Mr. Quigg's kidney functions, Dr. Rees

determined the limited use of anti-inflammatory medications such as

acetaminophen -- was medically appropriate to treat some of Mr. Quigg's other

medical needs.  (SUF at ¶ 42.)  Dr. Rees continued to monitor Mr. Quigg's kidney

function through blood tests -- when Mr. Quigg did not refuse the tests -- to ensure

there was no negative impact from the prescribed medications.  (SUF at ¶ 43.)  Dr.

Rees contends that he could not have issued an order allowing Mr. Quigg to eat a

"kidney health diet" as he has no control over MSP inmate diets.  (SUF at ¶ 44,

disputed.)

Mr. Quigg argues that Dr. Rees provided no treatment or any medications for his kidney disease and refused to order a kidney-healthy diet.  He claims that any kidney function improvement had nothing to do with Dr. Rees.  (SDF at ¶ 41.) He cites to inadmissible medical articles for the proposition the some of the medications prescribed could be dangerous to kidneys.  (SDF at ¶ 42.)  Mr. Quigg contends that medical diets are routinely prescribed at MSP for prisoners with diabetes and other medical conditions and that he had been on a "food allergy" diet at MSP prior to Dr. Rees being at MSP.  (SDF at ¶ 44.)

Mr. Quigg has not presented sufficient admissible evidence to create an issue of fact regarding whether Dr. Rees' "chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058.  This claim should be dismissed.

### 4. Osteoporosis

Mr. Quigg contends that Dr. Rees refused to provide medications and bone density testing for his osteoporosis.  He states he made written requests on May 25, 2018 to have his osteoporosis treated with medication (Fosamax) and have testing (bone density scan).  He contends the calcium and vitamin D tablets Dr. Rees referred to were brought in from outside and Dr. Rees discontinued them.  (Doc. 43-2 at 13.)

32

Mr. Quigg's osteoporosis was treated with Calcium+ D tablets, which according to Dr. Rees is a medically appropriate treatment.  (SUF at ¶ 55, undisputed.)  In addition, when Dr. Rees observed Mr. Quigg both in medical and non-medical settings, he saw no observable neurological deficits indicating other testing related to his osteoporosis was medically necessary or appropriate.  (SUF at ¶ 56.)  Mr. Quigg contends, however, that Dr. Rees later stopped giving him the calcium+D tablets, that Fosamax should have been prescribed with Calcium+ D, and that Dr. Rees should have ordered a "dual energy x-ray absorptiometry" (DEXA) scan that according to Mr. Quigg is the "gold standard' for measuring bone density to determine appropriate treatment.  (SDF at ¶ 55.)  He contends bone scans should be done every two years as done by Dr. Guzman.  (SDF at ¶ 56 citing Dr. Guzman's progress notes from October 16, 2014, Doc. 35-2 at 256.)  *See Estelle*, 429 U.S. at 107 ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment.").

Mr. Quigg has not presented sufficient admissible evidence to create an issue of fact regarding whether Dr. Rees' "chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058.  This claim should be dismissed.

## IV.  CONCLUSION

Dr. Rees met his burden of proving "that there is an absence of evidence to support" Mr. Quigg's claims of deliberate indifference.  *See Oracle Corp.*, 627 F.3d at 387 (*citing Celotex*, 477 U.S. at 325); *see also* Fed.R.Civ.P. 56(c)(1)(B). Mr. Quigg, in turn, failed to establish that a genuine issue as to any material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  Mr. Quigg simply relies upon his own disagreement with Dr. Rees's treatment.  There is a failure of proof concerning several essential elements of Mr. Quigg's claims necessitating entry of summary judgment.  *See Celotex*, 477 U.S. at 322.  He has not tendered any evidence to establish a genuine issue of material fact regarding his claims of deliberate indifference to his serious medical needs.  At most, Mr. Quigg has established a difference of opinion regarding his medical treatment which is insufficient to maintain an Eighth Amendment claim of deliberate indifference to a serious medical need.

Mr. Quigg provided no evidence to demonstrate that a reasonable jury could return a verdict in his favor.  See *Anderson*, 477 U.S. at 248.  Dr. Rees is entitled to summary judgment.

Based upon the foregoing, the Court issues the following:

### ORDER

Mr. Quigg's Motion in Limine (Doc. 45) is DENIED.

Further, the Court issues the following:

## RECOMMENDATIONS

1.  Defendant's Motion for Summary Judgment (Doc. 33) should be GRANTED.

2.  The Clerk should be directed to enter judgment and close this matter.

3.  The Clerk of Court should also be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.

## NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen days after service (mailing) hereof.[4]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P.  4(a), should not be filed

---

[4]Rule 6(d) of the Federal Rules of Civil Procedure provides that "[w]hen a party may or must act within a specified time after being served and service is made under Rule 5(b)(2)(C) (mail) . . . 3 days are added after the period would otherwise expire under Rule 6(a)."  Therefore, since Mr. Quigg is being served by mail, he is entitled an additional three (3) days after the period would otherwise expire.

until entry of the District Court's final judgment.

DATED this 24th day of November, 2020.


_____
John Johnston
United States Magistrate Judge